ANTHONY G. SIMON, Mo. Bar No. 38745 (*pro hac vice* application pending)
TIMOTHY E. GROCHOCINSKI, Mo. Bar No. 59607 (*pro hac vice* application pending)
The Simon Law Firm, P.C.
701 Market Street, Suite 1450
Saint Louis, Missouri 63101
Telephone: (314) 241-2929
Facsimile: (314) 241-2029
asimon@simonlawpc.com

ROBERT W. HICKS (Cal. Bar No. 168049)
KENNETH R. WRIGHT (Cal. Bar No. 176325)
Robert W. Hicks & Associates
14510 Big Basin Way, Suite 151
Saratoga, CA 95070
Telephone:   (619) 846-4333
Facsimile:   (408) 624-9369
rhicks@rwhlaw.com
kwright@rwhlaw.com

Plaintiff, TELECONFERENCE SYSTEMS, LLC

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

TELECONFERENCE SYSTEMS, LLC,

       Plaintiff,

    vs.

TANDBERG, INC., AVAGO
TECHNOLOGIES U.S., INC., BAYER
CORPORATION, ERICSSON, INC. and ONE
COMMUNICATIONS CORPORATION,

       Defendants.

Case No.:

COMPLAINT

**JURY TRIAL DEMANDED**

Teleconference Systems, LLC, ("TS") files this Complaint against Tandberg, Inc., Avago Technologies U.S., Inc., Bayer Corporation, Ericsson, Inc. and One Communications Corporation (collectively "Defendants") for infringement of United States Patent No. 6,980,526 (hereinafter "the '526 Patent"). A copy of the '526 patent is attached as Exhibit A.

## JURISDICTION

1.    This is an action for patent infringement under title 35 of the United States Code. TS is seeking injunctive relief as well as damages.

1.

COMPLAINT

2.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 (Federal Question) and 1338(a) (Patents) because this is a civil action for patent infringement arising under the United States patent statutes.

3.      Venue is proper under 28 U.S.C. §§ 1391(c) and 1400(b).

4.      TS is a Texas Limited Liability Company.

5.      Defendant Tandberg, Inc. ("Tandberg") is a Delaware corporation with its headquarters located in New York, New York and an office for the transaction of business in Bridgewater, New Jersey.  Tandberg has made, used, sold, offered for sale, offers for sale and/or imports apparatuses and/or systems that infringe one or more claims of the '526 patent. Tandberg has infringed and continues to infringe the '526 patent either directly or through the acts of contributory infringement or inducement in violation of 35 U.S.C. § 271.

6.      Defendant Avago Technologies U.S., Inc. ("Avago"), is a Delaware corporation with its headquarters located in San Jose, California.  Avago has made, used, sold, offered for sale, offers for sale and/or imports apparatuses and/or systems that infringe one or more claims of the '526 patent.  Avago has infringed and continues to infringe the '526 patent either directly or through the acts of contributory infringement or inducement in violation of 35 U.S.C. § 271.

7.      Defendant Bayer Corporation ("Bayer") is an Indiana corporation with its headquarters located in Pittsburgh, Pennsylvania.  Bayer has made, used, sold, offered for sale, offers for sale and/or imports apparatuses and/or systems that infringe one or more claims of the '526 patent.  Bayer has infringed and continues to infringe the '526 patent either directly or through the acts of contributory infringement or inducement in violation of 35 U.S.C. § 271.

8.      Defendant Ericsson, Inc. ("Ericsson") is a Delaware corporation with its headquarters located in Plano, Texas.  Ericsson has made, used, sold, offered for sale, offers for sale and/or imports apparatuses and/or systems that infringe one or more claims of the '526 patent.  Ericsson has infringed and continues to infringe the '526 patent either directly or through the acts of contributory infringement or inducement in violation of 35 U.S.C. § 271.

9.      Defendant One Communications Corporation ("One") is a Delaware corporation with its headquarters located in Burlington, Massachusetts.  One has made, used, sold, offered

2.

for sale, offers for sale and/or imports apparatuses and/or systems that infringe one or more claims of the '526 patent.  One has infringed and continues to infringe the '526 patent either directly or through the acts of contributory infringement or inducement in violation of 35 U.S.C. § 271.

10.     On information and belief, the systems, or components of the systems, that are alleged herein to infringe were made, used, imported, offered for sale and/or sold in the Northern District of California.

11.     This court has personal jurisdiction over defendants because the defendants have committed acts of infringement in this district; do business in this district; have systematic and continuous contacts in this district and/or have consented to jurisdiction here.

12.     TS incorporates paragraphs 1 through 12 herein by reference.

13.     This cause of action arises under the patent laws of the United States, and in particular, 35 U.S.C. §§ 271 *et seq.*

14.     TS is the exclusive licensee of the '526 patent with rights to enforce the '526 patent and sue infringers.

15.     The '526 Patent, titled "Multiple Subscriber Videoconferencing System," is valid, enforceable and was duly issued in full compliance with Title 35 of the United States Code.

## COUNT I

## INFRINGEMENT OF U.S. PATENT 6,980,526 BY
## DEFENDANT TANDBERG, INC.

16.     Tandberg has infringed and herein continues to infringe the '526 Patent by making, using, importing, offering for sale and/or selling multi subscriber videoconferencing systems, covered by one or more claims of the '526 Patent, including, but not limited to, its products in the Tandberg Telepresence Series and Tandberg Profile Series product lines.

17.     On information and belief, Cisco Systems, Inc. is acquiring Tandberg via a voluntary cash offering, which is anticipated to close in the first part of 2010.

3.

18.     Various parties are alleged to directly infringe one or more claims of the '526 patent via their use of multiple subscriber video conferencing systems.  While one or more components of the accused system may have been provided by Tandberg, Tandberg does not provide the entire system to each such party.  Therefore, disposition of TS' claims against Tandberg would not be dispositive of TS' claims against the third parties.

## DIRECT INFRINGEMENT

19.     Tandberg and the other named defendants have infringed and continue to infringe the '526 patent by using a system covered by one or more claims of the '526 patent, including, a multiple subscriber video conferencing system.

## INDIRECT INFRINGEMENT

### (Contributory Infringement)

20.     Tandberg has contributorily infringed and continues to contributorily infringe the '526 patent pursuant to 35 U.S.C. § 271.

21.     As alleged above, Tandberg, defendants and others are direct infringers of the '526 patent.

22.     Tandberg offers to sell and sells components of the accused systems to others in the United States.

23.     The components Tandberg provides are material components of a patented article and/or a material component used in practicing a patented process.

24.     The components Tandberg provides are not a staple article of commerce suitable for substantial non-infringing use.

25.     Tandberg's actions were performed with knowledge that the components are especially made or adapted for use in an infringement of the '526 patent.

4.

COMPLAINT

**(Inducing Infringement)**

26.　　Tandberg has induced others to infringe and continues to induce others to infringe the '526 patent, pursuant to 35 U.S.C. § 271.

27.　　As alleged above, Tandberg and others are direct infringers of the '526 patent.

28.　　Tandberg offers to sell and sells various components of the accused system.

29.　　Tandberg knowingly induced and continues to induce infringement of one or more claims of the '526 patent and possessed specific intent to encourage defendants' and others' infringement.

30.　　Tandberg knew or should have known that its actions alleged herein would induce actual infringements of one or more claims of the '526 patent.

31.　　Tandberg intended to cause the acts of defendants and others that constitute the direct infringement of the '526 patent.

32.　　On information and belief, Tandberg has had knowledge of the '526 patent since at least the inception of this action, and possibly since the inception of litigation against Cisco, but continues to sell such components and continues to instruct Customers how to use accused systems that are covered by one or more claims of the '526 patent.

33.　　On information and belief, since at least the filing of this action, Tandberg has been on notice of the '526 patent as well as of TS's infringement contentions, and on information and belief, has taken no steps to remedy any infringement.

34.　　Tandberg knew or should have known that its actions would cause direct infringement by defendants and others.

35.     This case is exceptional pursuant to the provisions of 35 U.S.C. § 285 because, among other reasons, Tandberg was on notice of TS's rights in the invention and '526 patent as alleged above and continued its activities as accused herein.

36.     TS has complied with 35 U.S.C. § 287.

37.     Tandberg's actions complained of herein are causing irreparable harm and monetary damage to TS and will continue to do so unless and until Plaintiffs are enjoined and restrained by this Court.

38.     TS is entitled to damages of at least a reasonable royalty for the use of TS' invention by Tandberg and others, including both cost savings and increased profits reaped by Tandberg and others from their infringement as alleged herein.

39.     Defendants' actions complained of herein will continue unless defendants are enjoined by this Court.

## COUNT II

### INFRINGEMENT OF U.S. PATENT 6,980,526 BY
### AVAGO TECHNOLOGIES U.S., INC., BAYER CORPORATION,
### ERICSSON, INC. and ONE COMMUNICATIONS CORPORATION

40.     On information and belief, defendant Avago has infringed and continues to infringe the '526 Patent by using a system covered by one or more claims of the '526 Patent, including, but not limited to a multiple subscriber video conferencing system.

41.     On information and belief, defendant Bayer has infringed and continues to infringe the '526 Patent by using a system covered by one or more claims of the '526 Patent, including, but not limited to a multiple subscriber video conferencing system.

42.     On information and belief, defendant Ericsson has infringed and continues to infringe the '526 Patent by using a system covered by one or more claims of the '526 Patent, including, but not limited to a multiple subscriber video conferencing system.

6.

43.     On information and belief, defendant One has infringed and continues to infringe the '526 Patent by using a system covered by one or more claims of the '526 Patent, including, but not limited to a multiple subscriber video conferencing system.

44.     Defendants have reaped significant cost savings from using TS's patented invention, including reduced travel expenses, and such infringement has increased defendants' productivity thereby increasing defendants' revenues and profit.

45.     Defendants herein are accused of directly infringing one or more claims of the '526 patent via their use of a multiple subscriber video conferencing system.  While one or more components of the accused system may have been provided by Tandberg, Tandberg does not provide the entire system to each defendant.  Therefore, disposition of TS' claims against Tandberg would not be dispositive of TS' claims against the remaining defendants.

46.     TS is entitled to damages of at least a reasonable royalty for the use of TS's invention by defendants, including both cost savings and increased profits reaped by the defendants from their infringement as alleged herein.

47.     Defendants' actions complained of herein will continue unless defendants are enjoined by this Court.

48.     This case is exceptional pursuant to the provisions of 35 U.S.C. § 285.

49.     TS has complied with 35 U.S.C. § 287.

50.     Defendants' actions complained of herein are causing irreparable harm and monetary damage to TS and will continue to do so unless and until Defendants are enjoined and restrained by the Court.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Teleconference Systems, LLC, asks the Court to:

A. Enter judgment for Plaintiff on this Complaint;

B. Enjoin Defendants, their agents, officers, servants, employees, attorneys and all persons in active concert or participation with Defendants who receive notice of the order from further infringement of United States Patent No. 6,980,526;

7.

C.  Award Plaintiff damages resulting from Defendants' infringement in accordance with 35 U.S.C. § 284;

D.  Treble the damages in accordance with the provisions of 35 U.S.C. § 284;

E.  Find the case to be exceptional under the provisions of 35 U.S.C. § 285;

F.  Award Plaintiff reasonable attorney fees under 35 U.S.C. § 285;

G.  Order the impounding and destruction of all Defendants' apparatuses that infringe the '526 Patent;

H.  Award Plaintiff pre-judgment and post-judgment interest and costs; and

I.  Award Plaintiff such further relief to which the Court finds Plaintiff entitled under law or equity.

## JURY DEMAND

Plaintiff, Teleconference Systems, LLC, demands a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated:  March 29, 2010                     ROBERT W. HICKS & ASSOCIATES

By: _____

Kenneth R. Wright
Robert W. Hicks & Associates
14510 Big Basin Way, Suite 151
Saratoga, CA  95070
Telephone:(619) 846-4333
Facsimile: (408) 624-9369


Anthony G. Simon
Timothy E. Grochocinski
The Simon Law Firm, P.C.
701 Market Street, Suite 1450
Saint Louis, Missouri  63101
Telephone:  (314) 241-2929
Facsimile:  (314) 241-2029

Attorneys for Plaintiffs

8.

# Exhibit A

Case3:10-cv-01325-JSW Document1 Filed03/26/10 Page10 of 29

US006980526B2

## (12) United States Patent
Jang et al.

(10) Patent No.: **US 6,980,526 B2**
(45) Date of Patent: **Dec. 27, 2005**

(54) **MULTIPLE SUBSCRIBER VIDEOCONFERENCING SYSTEM**

(75) Inventors: **Saqib Jang**, Woodside, CA (US); **Mark Kent**, Los Altos Hills, CA (US)

(73) Assignee: **Margalla Communications, Inc.,** Woodside, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 917 days.

(21) Appl. No.: **09/819,548**

(22) Filed: **Mar. 26, 2001**

(65) **Prior Publication Data**

US 2001/0043571 A1    Nov. 22, 2001

**Related U.S. Application Data**

(60) Provisional application No. 60/191,819, filed on Mar. 24, 2000.

(51) Int. Cl.⁷ ............................................. **H04L 12/16**
(52) U.S. Cl. ...................... **370/260**; 370/352; 370/401
(58) Field of Search ................................ 370/260, 261, 370/262, 264, 265, 351, 352, 353, 354, 401, 370/402, 494, 495

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,838,664 A | 11/1998 | Polomski | |
| 5,867,494 A | 2/1999 | Krishnaswamy et al. | |
| 5,867,495 A | 2/1999 | Elliott et al. | |
| 5,903,302 A * | 5/1999 | Browning et al. | ...... 348/14.08 |
| 5,999,525 A | 12/1999 | Krishnaswamy et al. | |
| 5,999,966 A * | 12/1999 | McDougall et al. | ....... 709/204 |
| 6,025,870 A * | 2/2000 | Hardy | ...................... 348/14.1 |
| 6,078,810 A * | 6/2000 | Olds et al. | ................. 455/428 |
| 6,097,719 A | 8/2000 | Benash et al. | |
| 6,147,988 A | 11/2000 | Bartholomew et al. | |
| 6,157,401 A | 12/2000 | Wiryaman | |
| 6,188,687 B1 * | 2/2001 | Mussman et al. | .......... 370/388 |
| 6,205,135 B1 | 3/2001 | Chinni et al. | |
| 6,262,978 B1 * | 7/2001 | Bruno et al. | ................ 370/260 |
| 6,373,850 B1 * | 4/2002 | Lecourtier et al. | ......... 370/409 |

OTHER PUBLICATIONS

"Next Generation IP Conferencing Services" Ridgeway Systems & Software white paper, 1999.
James Toga and Hani ElGebaly, "Demystifying Multimedia Conferencing Over the Internet Using the H.323 Set of Standards," *Intel Technology Journal Q2 '98*, pp. 1-11.
www.teleconferencemag.com/html/issues/issues2000/dec_2000/1200view.html, Dec. 2000.
www.teleconferencemag.com/html/issues/issues2000/dec_2000/1200view.html, Nov. 2000.
www.teleconferencemag.com/html/issues/issues2000/dec_2000/1200 view.html, Oct. 2000.

(Continued)

*Primary Examiner*—Phirin Sam
(74) *Attorney, Agent, or Firm*—Alleman Hall McCoy Russell & Tuttle LLP

(57) **ABSTRACT**

A system, method, and device for use in videoconferencing. The method typically includes installing a videoconferencing services switch at an access point to an IP network, and registering a plurality of subscribers for videoconferencing services. Each subscriber typically has a plurality of endpoints. The method further includes receiving subscriber-specific settings to be applied to multiple videoconferencing calls from the plurality of endpoints associated with each subscriber. The method further includes storing the subscriber-specific settings at a location accessible to the switch, and configuring the switch to connect calls from the plurality of endpoints at each subscriber based on the corresponding subscriber-specific settings.

**26 Claims, 10 Drawing Sheets**



US 6,980,526 B2

Page 2

## OTHER PUBLICATIONS

www.q...1,720,,00.html?printVersion=1&xmlFilename=2000
May11274
&storyId=27, May 2000.

biz.yahoo.com/prnews/010207/ca_interna.html.

"Multiprotocol Label Switching Architecture," ftp.isi.edu/in-notes/rfc3031.txt, Jan. 2001.

"BGP/MPLS VPNs," ftp.isi.edu/in-notes/rfc2547.txt, Jan. 2001.

"Firewall Vulnerability and Network Protection for Streaming and Emerging UDP Applications," Networking Systems Laboratory NEC USA, Inc., Aug. 2000.

"High Performance H.323 Firewalling for VoIP Solutions," Aravox Technologies.

"IP Service Intelligence at the Edge," Copper Mountain Networks, Inc. and Spring Tide Networks, Inc.

"IP and Frame Relay: Bridging the Gap for Seamless and Secure Virtual Private Networking," CoSine Communications white paper.

"H.323 and Firewalls: Problem Statement and Solution Framework," ftp.yars.free.net/pub/doc/Drafts/draft-shore-h323-firewalls-00.txt.gz, Feb. 3, 2000.

"H.323 and Firewalls: The problems and pitfalls of getting H.323 safely through firewalls," Intel Corporation, Revision 2.0, Mar. 21, 2001.

* cited by examiner



FIG. 1



FIG. 2



FIG. 3



FIG. 4A



FIG. 4B



500
INSTALL VIDEOCONFERENCING SERVICES SWITCH AT ACCESS POINT TO INTERNET PROTOCOL (IP) NETWORK
502
REGISTER SUBSCRIBERS FOR IP VIDEOCONFERENCING SERVICES
504
RECEIVE SUBSCRIBER-SPECIFIC SETTINGS TO BE APPLIED TO MULTIPLE VIDEOCONFERENCING CALLS
506
STORE SUBSCRIBER-SPECIFIC SETTINGS AT LOCATION ACCESSIBLE TO SWITCH
508
CONFIGURE SWITCH TO CONNECT CALLS BETWEEN SUBSCRIBERS BASED ON CORRESPONDING SUBSCRIBER-SPECIFIC SETTINGS
510
RECEIVE AND PROCESS CALL
512
RECEIVE CALL CONNECTION REQUEST
514
CONNECT REQUESTED CALL, USING H.323/SIP PROTOCOL
516
MONITOR CALL
518
RECEIVE CALL TERMINATION REQUEST
520
LOG CALL RECORD
522

FIG. 5

Case3:10-cv-01325-JSW   Document1   Filed03/29/10   Page18 of 29



FIG. 6



FIG. 7



FIG. 8



FIG. 9

FIG. 10

US 6,980,526 B2

1

## MULTIPLE SUBSCRIBER VIDEOCONFERENCING SYSTEM

### CROSS REFERENCE TO RELATED APPLICATIONS

This application claims priority under 35 U.S.C. § 119(e) to U.S. Provisional Patent Application No. 60/191,819 entitled "System and Method for Security and Management of Streaming Data Communications on a Computer Network System," filed Mar. 24, 2000, the disclosure of which is herein incorporated by reference.

### TECHNICAL FIELD

The present invention relates generally to videoconferencing, and more particularly to a system, method, and device for implementing a multiple subscriber videoconferencing service for use on Internet Protocol (IP) networks.

### BACKGROUND OF THE INVENTION

Videoconferencing provides a convenient way for users in distant locations to participate in a face-to-face meeting, without having to spend time and money traveling to a central meeting site. Many prior videoconferencing systems have been based on circuit switched Integrated Services Digital Networks (ISDN) standards. ISDN lines typically offer guaranteed quality of service, with specialized lines having high transmission rates. This enables high-quality video and audio signals to be delivered to the conferencing participants. However, ISDN videoconferencing is extremely expensive, because ISDN lines are costly to install and lease, and because specialized hardware is required at the sites of the users. Because of this expense, ISDN videoconferencing systems are typically offered in a specialized videoconferencing room, rather than at each desktop computer of each employee in an enterprise. In addition, ISDN can be complicated to set up, and unreliable. ISDN calls on average take more than 10 minutes to set-up, and greater than 10% of calls are dropped without being completed.

Recently, another approach to videoconferencing has emerged for use on packet-switched Internet Protocol (IP) networks, using the H.323 and Session Initiation Protocol (SIP) standards. H.323 is a standard approved by the International Telecommunication Union (ITU) in 1996 to promote compatibility in videoconferencing transmissions over IP networks. SIP is a proposed Internet Engineering Task Force (IETF) standard for multimedia communication over IP networks.

Videoconferencing over IP networks has a number of fundamental problems, including security, bandwidth utilization, quality of service, and deployment and management. Regarding security, H.323 and SIP are difficult to implement with current firewalls. The difficulty lies in the fact that H.323 and SIP are complex protocols and use multiple dynamically allocated ports for each call. Because of the heavy use of dynamically allocated ports, it is not possible to preconfigure firewalls to allow SIP- or H.323-signaled traffic without opening up large numbers of holes in the firewall. This represents a more lax firewall policy than would be acceptable at most enterprises. In addition, SIP or H.323 video endpoints behind a firewall typically cannot receive calls from external parties due to firewall policies in place at most enterprises.

2

Many enterprises also deploy Network Address Translation (NAT) devices, often implemented as part of a firewall application, to connect the enterprise network having private IP unregistered addresses to a public IP network with globally unique registered addresses. NAT is generally used for two purposes: 1) as a mechanism to work around the problem of IPv4 address space depletion, and 2) for security purposes (to hide internal IP addressing policy from outside entities). A NAT device rewrites IP headers as packets pass through the device. The NAT device maintains a table of mappings between IP addresses and port numbers. The problem with sending H.323 and SIP traffic through a NAT device is that these protocols make heavy use of embedded IP addresses, while normal data traffic contain IP addresses in the header of each packet. While configuring a NAT to rewrite packet headers to change addresses is relatively straightforward, it is very difficult to configure a NAT to translate addresses that are embedded in H.323 and SIP traffic, because the location of these address in these data stream is difficult to calculate.

Regarding bandwidth utilization, in order to achieve a quality sufficient for business videoconferencing, a minimum of 384 Kbps bandwidth is generally required per videoconferencing participant. Multiple users simultaneously engaged in videoconferencing applications may use up available bandwidth on a local area network (LAN), slowing down other critical network operations. Current systems do not allow a network administrator to control easily the bandwidth usage of multiple network users. Therefore, network administrators are reluctant to deploy videoconferencing systems.

Regarding quality of service, typical IP networks do not provide guaranteed transmission speeds for videoconferencing data. Videoconferencing data generally is indistinguishable from other data on IP networks, such as email and web page data. Data on IP networks may be delayed due to network congestion. While small delays are generally not a problem for less time sensitive data such as email, it can severely affect picture and audio quality for videoconference participants.

The above discussed issues lead to another problem with current videoconferencing systems, namely, that enterprises cannot easily outsource videoconferencing services to outside service providers. Currently, service providers are not able to cost-effectively provide videoconferencing services to a large number of subscribers, because specialized equipment must be deployed or existing equipment must be upgraded at every subscriber site. This results in an expensive up-front capital investment as well as significant operational expenses for the service provider. Up-front equipment installations take time at each subscriber, resulting in a slow deployment of the videoconferencing capabilities to subscribers. In addition, the high up-front costs result in decreased service provider profit margins. It is difficult to grow such a service because each subscriber adds to an incremental growth in the capital equipment pool because these resources are not shared.

Because of the cost and reliability issues with ISDN, and because of the security, bandwidth utilization, quality of service, and deployment and management issues with H.323 and SIP, it is difficult for the average enterprise to upgrade and customize its network to enable videoconferencing. In addition, it is difficult for service providers to cost-effectively provide an outsourced videoconferencing service on a per-subscriber basis. Thus there exists a need for a videoconferencing system, method, and device for delivering secure, high-quality videoconferencing services over an IP

US 6,980,526 B2

3

network to multiple enterprise subscribers in a manner that does not require expensive upgrading and customization of the enterprise network.

## SUMMARY OF THE INVENTION

A system, method, and device for use in videoconferencing are provided. The method typically includes installing a videoconferencing switch at an access point to an IP network, and registering a plurality of subscribers for videoconferencing services. Each subscriber typically has a plurality of endpoints. The method further includes receiving subscriber-specific settings to be applied to multiple videoconferencing calls from the plurality of endpoints associated with each subscriber. The method further includes storing the subscriber-specific settings at a location accessible to the switch, and configuring the switch to connect calls from the plurality of endpoints at each subscriber based on the corresponding subscriber-specific settings.

According to another embodiment of the invention, the method may include installing a video services switch on a service provider network at an access point configured to enable multiple enterprise subscribers to access a global packet-switched computer network to exchange data, including videoconferencing data and non-videoconferencing data. The video services switch is typically configured to process videoconferencing data from multiple enterprise subscribers. The method further includes, at the video services switch, receiving a request for a videoconferencing call from an origination endpoint of one of the multiple enterprise subscribers, and connecting the videoconferencing call to a destination endpoint, the videoconferencing call having associated videoconferencing data. The method may further include securing the videoconferencing call based on subscriber-specific security settings.

The device typically includes a control plane module configured to receive subscriber-specific videoconferencing call settings for each of a plurality of video services subscribers, the videoconferencing call settings being for multiple calls placed from each video services subscriber, and a data plane module configured to receive videoconferencing data streams from multiple subscribers and manage these videoconferencing data streams according to the subscriber-specific videoconferencing call settings for each subscriber.

The system typically includes a service provider network configured to enable users of multiple enterprise subscriber networks to transfer data via a global computer network, the service provider network having an access point. The system also includes a videoconferencing services switch located on the access point of the service provider network. The videoconferencing services switch is configured to process videoconferencing calls from terminals on each of the multiple subscriber networks, based on subscriber-specific settings.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic view of a videoconferencing system according to one embodiment of the present invention.

FIG. 2 is a schematic view of a videoconferencing system according to another embodiment of the present invention.

FIG. 3 is a schematic representation of a hardware configuration of a videoconferencing switch of FIG. 1.

FIG. 4A is a software architecture of the videoconferencing system of FIG. 1.

FIG. 4B is a continuation of the software architecture of FIG. 4A.

4

FIG. 5 is a flowchart of a videoconferencing method according to one embodiment of the present invention.

FIG. 6 is a flowchart of one exemplary method for accomplishing the step of configuring the switch of the method of FIG. 5.

FIG. 7 is a flowchart of one exemplary method for accomplishing the step of configuring the security module of the method of FIG. 6.

FIG. 8 is a flowchart of one exemplary method for accomplishing the step of configuring the quality of service module of the method of FIG. 6.

FIG. 9 is a flowchart of one exemplary method for accomplishing the step of configuring the user-specific and subscriber-specific settings of the method of FIG. 6.

FIG. 10 is a schematic view of an enterprise video gateway of FIG. 1.

## DETAILED DESCRIPTION OF THE INVENTION

Referring initially to FIG. 1, a videoconferencing system according to one embodiment of the present invention is shown generally at 10. System 10 typically includes a videoconferencing services switch (VSS) 12 positioned on a service provider network 14 at an access point 16, typically a point of presence (POP). Switch 12 is configured to register multiple enterprise subscriber networks 18 for videoconferencing services, receive subscriber-specific settings for each subscriber 18 related to security and management of the videoconferencing calls from that subscriber, and process videoconferencing calls from each subscriber based on the associated subscriber-specific settings.

Service provider network 14 typically includes a packet-switched Internet Protocol (IP) network through which multiple enterprise subscriber networks 18 may access a global IP network 20, such as the Internet 20. Typically, the service provider network 14 includes an access point 16, such as a POP 16. The POP has a unique IP address and/or dial-up telephone number that a device on the enterprise subscriber network 18 may contact to access network 20.

POP 16 typically includes an edge router 20 and a core router 22 configured to route IP traffic into and out of POP 16. POP 16 also includes a plurality of services switches 24, including videoconferencing services switch 12, described above, Voice Over Internet Protocol (VOIP) services switch 26, and Virtual Private Network (VPN) services switch 28. Upon instruction, edge router 20 is configured to route traffic coming into POP 16 to an appropriate services switch for service-specific processing, or to core router 22 via direct link 30. Core router 22, in turn, is configured to route traffic from either of the services switches 24, or from direct link 30 out to the Internet 20. The traffic may be routed across a metropolitan area or long-haul backbone, which may be leased or owned by the service provider.

Traffic coming into the POP can be classified into videoconferencing data and non-videoconferencing data. Videoconferencing data typically includes control data and streaming voice and audio data according to the H.323 or SIP standards. H.323 refers to International Telecommunications Union, Telecommunications Sector, Recommendation H.323 (version 1, published November 1996; version 2, published 1998, entitled, "Visual Telephone Systems and Equipment for Local Area Networks Which Provide a Non-guaranteed Quality of Service," the disclosures of which are herein incorporated herein by reference. SIP refers to Session Initiation Protocol Proposed Standard (RFC 2543), Internet Engineering Task Force (IETF) (published March

US 6,980,526 B2

5

1999), the disclosure of which is incorporated herein by reference. Non-videoconferencing data includes, for example, email, web pages, VOIP traffic, VPN traffic, etc. Videoconferencing data is typically routed through POP 16 via videoconferencing services switch 12, while non-video-conferencing data is routed around the switch.

Each of enterprise subscriber networks 18 typically includes a plurality of terminals 34. Terminals 34, along with video conferencing service switch 12 and the various other components of system 10, are typically H.323 or SIP compliant. Terminals 34 are typically videoconferencing devices configured to display and record both video and audio. Terminals 34 may be desktop computers, laptop computers, mainframes and/or workstation computers, or other video-conferencing devices. Terminals 34 may also be described as "endpoints" in a videoconferencing call. The terminal 34a originating the videoconferencing call is referred to as an origination endpoint 34a, and the other terminals requested to join in the call are referred to as destination terminals, shown at 34b, 134a, 134b. Terminal 34b is a local zone destination terminal, while terminals 134a, 134b are remote zone destination terminals. Local and remote zones are defined below.

Each enterprise subscriber network 18 also typically includes an enterprise video gateway 36 and enterprise edge router 38. Enterprise edge router 38 is configured to route data traffic between terminals 34 and service provider network 14, based on source and destination IP addresses.

Enterprise video gateway 36 typically includes an emulation module 40 which emulates H.323/SIP call control and firewall functionality and an encryption module 44. The gateway also typically has a globally routable IP address and is configured to manage secure communication between terminals 34 and the videoconferencing services switch 12. Typically, emulation module 40 appears to terminals 34 as H.323 gatekeeper/SIP proxy and H.323/SIP application proxy firewall which includes network address translation (NAT) capability, which hides internal address from outside devices.

As shown in FIG. 10, enterprise video gateway 36 includes an encryption module 44. Encryption module 44 is typically an IP Security (IPSec) authentication and encryption module 44 configured to encrypt videoconferencing data coming from terminals 34 and send the encrypted data to videoconferencing switch 12. The IPSec protocols have been adopted by the Internet Engineering Task Force, and are described in the RFC 2411 entitled "IP Security Document Roadmap" (published November 1998), the disclosure of which is herein incorporated by reference. By using IPSec, a Virtual Private Network (VPN) may be created between the gateway 36 and the switch 12. VPN refers to a network that is carried over public networks, but which is encrypted to make it secure from outside access and interference.

Videoconferencing data may be carried from terminal 34 to service provider network 14 via one of two routes. First, the videoconferencing data may be routed by edge router 38 via a direct network connection 42, such as a T1 connection, to the videoconferencing services switch 12 of the service provider network 14. In this case, the direct network connection is dedicated to video traffic. Second, firewall 40 may be configured to pass encrypted videoconferencing data through the firewall unexamined. Typically, the encrypted videoconferencing data is encrypted by the encryption module 44 of the enterprise video gateway 36 using the IPSec protocols, discussed above.

6

System 10 is divided into local metropolitan zone 11 and remote metropolitan zone 111 separated by backbone 32. Local metropolitan zone 11 includes all devices that connect to POP 16, and remote metropolitan zone 111 includes all devices that connect to POP 116. Components within remote metropolitan zone 11 are similar to those in local metropolitan zone 11 and are numbered correspondingly, and therefore will not be redescribed in detail.

System 10 may be configured to connect a two-party or multiparty videoconference call from an origination terminal 34a to a destination terminal 34b on local zone 11, and/or one or more destination terminals 134a and 134b on remote zone 111. A destination terminal on local zone 11 may be referred to as a local destination terminal, and a destination terminal on remote zone 111 may be referred to as a remote destination terminal.

FIG. 2 shows another embodiment of a videoconferencing system 210 having a local zone 211. It will be appreciated that a remote zone of system 2 10 is a mirror image of zone 211, similar to that described above for system 10. Local zone 211 includes multiple enterprise subscriber networks 218 linked to a Digital Subscriber Line (DSL) service provider network 214 via an access point 216, typically called a central office.

Each enterprise subscriber network 218 includes a plurality of terminals 234 which are similar to terminals 34 described above. Integrated Access Device (IAD) 246 is configured to receive traffic from enterprise subscriber networks 218 and forward the traffic to the Digital Subscriber Line Access Multiplexor (DSLAM) 248. The DSLAM is configured to multiplex the traffic from the IADs and forward it to Asynchronous Transmission Mode (ATM) switch 250, where the signals are demultiplexed for transmission over a long-haul backbone. ATM switch 250 is configured to route videoconferencing data to and from terminals 234 and the backbone via videoconferencing services switch 212, and non-videoconferencing data via ISP router 252, or another services switch.

FIG. 3 shows an exemplary hardware configuration for videoconferencing services switch 12. One switch that may be purchased and programmed to implement the present invention is the Intel Exchange Architecture (IXA) WAN/Access switch, commercially available from Intel Corporation, of Santa Clara, Calif. and Radisys Corporation of Hillsboro, Oreg.

Switch 12 typically includes a control plane module 302 and a data plane module 304. Control plane module 302 includes a host processor, linked to an input/output network interface 308 and a memory 310. Typically, memory 310 includes RAM and ROM, although another form of memory may also be used, such as flash memory. Alternatively, a storage device such as a hard drive may also be attached to host processor 306. Control plane module 302 is configured to receive control data such as call set-up information through network interface 308, data plane ingress port 318, or data plane egress port 320. The call set-up information is processed according to H.323 or SIP specifications by host processor 306. Typically, the programs and data necessary for processing the call are stored in memory 310 and implemented by host processor 306. For example, the virtual router, call control module, quality of service module, policy engine, and security module are typically stored in memory 310.

Control plane module 302 is linked to data plane module 304 via a bus 312. Data plane module 304 includes a network processor 314 and memory configured to receive and manage transfer of real-time audio and video data

US 6,980,526 B2

7

streams from ingress ports **318** to egress ports **320**. Data plane module **304** typically includes a wire-speed switching fabric, capable of processing real-time data streams with virtually no appreciable latency.

The wire-speed switching fabric is configured to enable transport of streaming data traffic across system with virtually no appreciable latency, even as the streaming data traffic is processed and analyzed by system **10** to impose H.323/ NAT-specific firewall and NAT capabilities, policies from policy engine **418**, monitor quality of service, and provide optional encryption and other security measures. One implementation of system **10** is configured to provide aggregate streaming data throughput of up to 1.048 Gbps with full security and policy management, quality of service management, and encryption. The wire-speed switching fabric includes full support for IETF standard IP routing protocols such as Open Shortest Path First (OSPF), Border Gateway Protocol (BGP), and Routing Information Protocol (RIP), which are well known in the networking arts. Support of these routing protocols will allow system **10** to forward video traffic appropriately to edge router **20** and core router **22** in the service provider access point **116**.

FIG. 4 shows a schematic view of the software components of videoconferencing system **10**. Enterprise network **18** typically includes terminal **34** having terminal settings **408a**, enterprise video gateway **36** having gateway setting **408o**, and an enterprise edge router/IAD **38**, **248** having enterprise router setting **408b**. Settings **408a**, **408o**, and **408b** are referred to as enterprise network resident settings, while the remaining settings **408c–408n**, **408p** are referred to as switch resident settings.

Terminal settings **408a** typically include the IP address of the enterprise gateway, which acts as a proxy to the call control module **413** in videoconferencing switch **12**. For calls placed with the H.323 protocol, the IP address of the enterprise gateway **36** (which also acts as a proxy to the videoconferencing services switch H.323 gatekeeper **414**) is provided. For calls placed with the SIP protocol, the IP address of the enterprise gateway **36** (which also acts as a proxy to the videoconferencing services switch SIP proxy **416**) is provided. Terminals use the IP address of the enterprise gateway for registration (using e.g. H.323 RAS signaling), call initiation (using e.g. H.323 ARQ signaling), and audio/video data exchange (using e.g. RTP/RTCP protocols). Users may optionally authenticate themselves with H.323 gatekeeper/SIP proxy. The enterprise gateway **36** encapsulates these messages in packets having the enterprise video gateway's globally routable IP address as the source address and forwards these messages to the call control module **413** in videoconferencing services switch **12**. Typically, these packets are sent m an encrypted form using IPSec.

Enterprise video gateway settings **408o** include secure communication channel setting. Typically, this includes instructions on how to create a secure communication channel between the enterprise gateway and the videoconferencing switch **12** according to the IPSec protocol, discussed above. Traffic sent using the IPSec protocol typically passes through firewall **40** unexamined. Adjusting settings **408o** of the enterprise video gateway to enable IPSec communication and encrypted data exchange with the video services switch may either be accomplished locally by the enterprise administrator or service provider personnel via subscriber network management application **401**, or remotely via the video conferencing services management application **402**.

Enterprise edge router settings **408b** typically include the globally routable IP address of the enterprise gateway **36**,

8

and the address of an H.323 gatekeeper **414** and/or SIP proxy **416** within the videoconferencing services switch **12**. The enterprise edge router may also be configured to direct traffic from a terminal to the gatekeeper **414** or proxy **416** along direct connection **42**. Enterprise edge router settings **408b** may also include prioritization information for traffic passing though the edge router, such that the router may tag packets passing through with Diff-Serv labels or process packets based on Diff-Serv labels.

For DSL service provider network **112**, shown in FIG. 2, terminal settings **408a** are configured with the IP address of the call control module **413**, as discussed above. IAD settings **408b** are set to create a separate ATM permanent virtual circuit (PVC) or Frame Relay (FR) Data Link Communication Identifier (DLCI) for video traffic destined for the videoconferencing services switch. Optionally, the settings **408b** may include priority settings for processing and deliver of video PVC/DLCI traffic.

Switch **12** typically includes a tunneling service module **411** having subscriber-specific settings **408q**. The tunneling service module is configured to support secure communication channels from a multiple enterprise video gateways **36**, using the IPSec protocol described above. The tunneling service module unencapsulates traffic from enterprise video gateways **36**. It also maintains a dynamic mapping of IP address of each enterprise video gateway and port numbers so that the enterprise video gateway can correctly route call setup and video traffic back through to the appropriate enterprise video gateway.

Switch **12** typically includes a virtual router **412** configured to route requests from terminal **12** to call control module **413**. Typically, at least one virtual router having a unique IP address is provided for each subscriber network **18**. Traffic is routed between call control module **413** and enterprise video gateway/IAD **36**, **246** based on settings **408c**. The virtual router settings **408c** typically include the address of enterprise edge router **38** or IAD **246**, information about the dedicated physical connection **42**, and or the POP edge router **20**. Typically, a separate virtual router is provided for each enterprise subscriber. To configure the routing services, the switch provides BGP and OSPF routing on a per-virtual router basis. Thus, separate routing tables are maintained for each subscriber to segment its traffic.

Calls in the H.323 protocol are routed to virtual H.323 gatekeeper **414**, while calls in the SIP protocol are routed to SIP Proxy **416**. Call control module **413** is configured to perform call set-up operations, manage call data streams, and perform call tear-down operations.

Switch **12** also includes a policy engine **418** configured to enforce policies based on subscriber-specific settings on the videoconferencing calls. The policies may be based on subscriber-wide settings **408f** that apply to all calls from a given subscriber, and user-specific settings that apply to only a single user or terminal of a given subscriber. Exemplary policies include outbound/inbound calling privileges, encryption policies, bandwidth policies, priority among users policies, participation privileges, inbound/outbound calling restrictions, time-of-day restrictions, audio or video restrictions. Each of these exemplary policies may be implemented on a per-user or per-subscriber basis. For example, a particular user may be able to use unlimited bandwidth, have a top priority among users, be allowed to both view and participate in calls, be able to both initiate outbound and receive inbound calls, from 8am–6pm Mon–Fri, and not be restricted to only audio or only video calling.

Switch **12** also includes a quality of service module **420** having a Multi Protocol Label Switching (MPLS) traffic

US 6,980,526 B2

9
10

engineering module 422 configured to create a network path engineered according to the MPLS standard. The MPLS architecture is described in the January 2001 Request for Comments entitled "Multiprotocol Label Switching Architecture," published by the Internet Engineering Task Force, the disclosure of which is herein incorporated by reference. Module 422 is configured to create secure MPLS tunnels that offer a guaranteed bandwidth for video traffic, based on subscriber-specific settings 408h. Settings 408h may include the desired bandwidth a subscriber has purchased, or the type of security to be applied to the MPLS traffic, etc.

Quality of service module 420 also includes a bandwidth management module 424 configured to manage the bandwidth allocated to each videoconferencing call and/or call participant. By managing the bandwidth based on subscriber-specific bandwidth settings 408i, network congestion can be avoided.

Quality of service module 420 also includes a differentiated services module 426 configured to implement differentiated services policy management according to the Differentiated Services standard described in the Definition of Differentiated Services Per Domain Behavior and Rules for their Specification, published by the Internet Engineering Task Force (January 2001), the disclosure of which is herein incorporated by reference. This typically includes labeling a precedence parameter for video traffic, i.e. RTP streams, stored in settings 408j.

Quality of service module 420 also includes an IP-over-ATM module 428 configured to send IP traffic over ATM switches, and settings 408k therefor. IP over ATM module is compliant with the standards described in Internet Engineering Task Force Request for Comments (RFC) 2684. Typically, settings 408k for IP-over-ATM module 428 are configured on a per-virtual router and per-physical interface basis.

Quality of service module 420 also includes a video transmission analysis engine 430 configured to analyze videoconferencing data carried by the switch for quality parameters specified in transmission analysis settings 408m. Exemplary quality parameters include packet loss, jitter, and latency.

Videoconferencing services switch 12 also typically includes a security module 431. Security module 431 typically includes a SIP/H.323 firewall 432, SIP/H.323 NAT module 434, encryption module 436, and Virtual Private Network (VPN) module 438. SIP/H.323 firewall 432 is configured to prevent unauthorized access to video services switch 402, and through it to subscriber networks. The firewall settings 408n of firewall 432 are configured on a per-subscriber basis, such that a subscriber-specific firewall may be custom-implemented for traffic from each subscriber. SIP/H.323 NAT module 434 is configured to provide network address translation services for traffic flowing through switch 12. NAT settings 408l are also subscriber-specific. VPN module 438 is configured to create a virtual private network for data flowing from switch 12 over network 20.

System 10 typically includes a videoconferencing services management application 402 configured to enable the service provider to adjust the switch-resident settings of videoconferencing services switch 12 and settings 408o of enterprise video gateway 36, 236. System 10 also includes a subscriber network management application 410, by which an administrator may adjust settings of devices on subscriber network 18, such as settings 408a on terminal 34, 134, 408b on enterprise router/IAD 38, 246. Typically, subscriber network administrator uses subscriber network management

application 410 to adjust the settings of each terminal when the terminal is installed or reconfigured. Alternatively, terminal settings 410a may be set remotely by the service provider via videoconferencing services management application 402.

Videoconferencing services management application 402 is configured to interface with a database 404, which contains a database image 406 of records for subscriber-specific settings 408 for each of the multiple enterprise subscriber networks 18. Many of the subscriber-specific settings 408 are governed by a Service Level Agreement (SLA) 409. The SLA is an agreement executed between each enterprise subscriber and the service provider. The SLA contains terms for the level of videoconferencing service to be provided to a particular enterprise subscriber network. One exemplary term contained in the SLA is a video quality term, which indicates the maximum and/or minimum video quality the subscriber is to receive, either on a per-subscriber, per-user, or per-terminal basis. Often, video quality is defined as packet loss, jitter, and latency being within an acceptable predetermined range. While, typically, terminal settings 408a and enterprise router settings 408b are stored locally on enterprise subscriber network 18, it will also be appreciated that they may be stored on database 404. The switch resident settings are typically loaded into video services switch 12 periodically, such as once per day, by downloading database image 404 into memory of switch 12. The enterprise video gateway server settings 408r may be downloaded in a similar manner from database 404 via videoconferencing services management application 402.

In FIG. 5, a method according to one embodiment of the invention is shown generally at 500. Method 500 typically includes, at 502, installing a videoconferencing services switch (VSS) 12 at an access point 16 to an Internet Protocol (IP) network 20. At 504, the method typically includes switch 12 registering multiple enterprise subscriber networks 18 for IP videoconferencing services.

At 506, the method includes receiving subscriber-specific settings 408 to be applied to multiple videoconferencing calls originating from the subscriber. The subscriber-specific settings may be set and accessed by an administrator at an enterprise network and/or an administrator at service provider (SP) network 14 via management applications 402, 410, described above. At 508, the method further includes storing subscriber-specific settings at a location accessible to switch 12. Typically, the subscriber-specific settings are stored on switch 12 and enterprise video gateway 36, and in database 404. Certain subscriber-specific settings 408 may also be stored on terminal 34 and enterprise router 38, as described above.

At 510, method 500 includes configuring switch 12 to connect videoconferencing calls between subscribers based on corresponding subscriber-specific settings. Step 510 is typically accomplished via steps 602–620, described below.

At 512, the method further includes receiving and processing a videoconferencing call at switch 12. Typically, a user at a terminal 34 at enterprise subscriber network 18 initiates a call connection request for a videoconferencing call with a user at a destination terminal, such as remote destination terminals 134a, 134b or local destination terminal 34b. The call connection request typically includes pertinent information such as the origination and destination party address.

Step 512 is typically accomplished by, at 514, receiving the call connection request at switch 12 and proceeding to connect the requested call by using the H.323 or the Session

US 6,980,526 B2

11                                                                                    12

Initiation Protocol (SIP) protocol at **516**. The protocol used is determined by the subscriber-specific settings, or by the call request itself.

Once the call connection request is processed and video-conferencing is occurring, at **518**, the method includes monitoring the established videoconferencing call. Switch **12** may monitor or record call information related to videoconferencing such as quality, duration of call, etc.

Typically, when the user wishes to end the videoconferencing call, the user will send a call termination request. The method includes receiving the call termination request at **520**. The method further includes logging the videoconferencing call information in a call record at **522**. The call record may serve to provide billing information to SP **14** and to obtain data for quality assurance purposes. The call record may include length of call, parties on the call, bandwidth used by the call, measured quality of the call (as determined for example by jitter, latency, and packet loss), among other parameters.

Referring to FIG. **6**, configuring switch **12**, at **510**, to connect videoconferencing calls includes configuring various components and modules as shown. At **602**, step **510** includes configuring a tunneling module, which includes at **604**, creating an IPSec tunnel between switch **12** and gateway **36**. This step requires setting up IPSec authentication and encryption parameters on switch **12**, as described. The tunneling module unencapsulates traffic from gateway **36** and maintains a dynamic mapping of IP address of servers **36** and port numbers, thus allowing gateway **36** to route call set-up correctly and video traffic back through the appropriate gateway **36**.

Step **510** includes, at **606**, configuring a virtual router (VR) **412**, which includes, at **608**, creating VR **412** within switch **12** for subscriber **18**. Typically a subscriber edge router **20** is mapped onto switch **12**. VR **412** is integral to module segmentation and layering architecture of switch **12**.

Step **606** further includes, at **610**, configuring routing services for subscriber **18**, which includes the support of BGP and OSPF routing using VR **412**. Typically routing tables are maintained for subscriber **18** to segment traffic.

Step **510** includes, at **612**, configuring a call-control module. At **614**, step **612** includes configuring H.323 gatekeeper **414** and/or SIP proxy **416** for subscriber **18**. For H.323 gatekeeper **414**, configuring gatekeeper **414** includes configuring a subscriber zone in gatekeeper **414**, discovery and registration of endpoints, security, inter-gatekeeper communication, creation of records for billing and administrative purposes, etc. For SIP proxy **416**, configuring proxy **416** includes discovery and registration of endpoints, information from Domain Name Service (DNS) server, creation of records, etc.

Step **510** further includes configuring security module at **616**, configuring quality of service module at **618**, and configuring user-specific and subscriber-specific settings on a policy engine **418** at **620**.

Referring to FIG. **7**, step **616** includes configuring H.323/ SIP firewall **432** at **702**. H.323/SIP applications parse control data to dynamically open and close ports for control traffic. Information obtained from parsing is sent to network data plane hardware **304**. Configuring firewall **432** includes adding firewall address information into gatekeeper **414** for the zone, setting ports or channels that are statically open, and setting security logging.

Step **616** further includes configuring H.323/SIP network address translation (NAT) module at **704**. For H.323 NAT module, the NAT module is configured to parse packet headers and payload of Q.931/H.245 control data streams

during call set-up. For outgoing data, the NAT module is further configured to substitute non-routable endpoint source IP addresses and port numbers with its own globally unique H.323 proxy IP address and port numbers. For incoming data, the NAT substitutes non-routable, or internal endpoint destination IP addresses and port numbers by using stored IP address/port number mapping information.

Step **616** further includes configuring the encryption module at **706**. Encryption is used only at certain enterprise subscribers **18** and destination IP addresses. For example, enterprises **18** may want encrypted communication with selected destination parties.

Lastly, step **616** includes configuring virtual private network (VPN) module at **708**. Configuring VPN module includes configuring a subscriber VR with MPLS VPN capability including creation of VPN routing/forwarding tables. Step **708** further includes configuring BGP routing sessions, VR to SP edge-routing sessions, RIP/BGP/static route to subscriber edge-routing sessions, etc. By configuring switch **12** to support an MPLS VPN module, video-specific VPNs can exist across ATM, IP and L2-type backbone networks. In addition, subscribers to MPLS VPNs may be dynamically updated to enable simplified creation of extranet and intranet VPNs and site-to-site video traffic delivery.

Referring to FIG. **8**, step **618** of configuring quality of service module includes configuring an MPLS traffic engineering (TE) module at **802**. Configuring switch **12** to support MPLS TE enables creation of premium-priced guaranteed bandwidth videoconferencing data paths across an SP MPLS backbone. Step **802** further includes configuring of MPLS tunnels, enabling of express forwarding of data, and enabling Intermediate System-Intermediate System (IS-IS) routing, as is commercially implemented in the products of Cisco Systems of San Jose, Calif. This is typically accomplished by adjusting settings **408h**.

At **804** the method further includes configuring bandwidth management module **422**, typically by adjusting settings **408i**. This enables setting of maximum video bandwidth allowed into or from an enterprise subscriber by time of day.

At **806**, the method further includes configuring differentiated services (Diff-Serv) module **426** at **806**, typically by adjusting Diff Serv settings **408j**. These settings may be used to configure the TOS/IP precedence field for video traffic (i.e. RTP streams) to/from each enterprise. This enables core devices in an SP network to give prioritized treatment to video traffic.

At **808**, the method further includes configuring IP over asynchronous transfer mode (ATM) module, typically by adjusting settings **408k**. IP over ATM services are configured on a per-virtual router and per-physical interface basis.

At **810**, the method further includes configuring video transmission analysis module, typically by adjusting settings **408m**. Configuration of size of jitter buffer within the videoconferencing services switch is accomplished on a per-enterprise subscriber basis.

FIG. **9** shows, in steps **902**–**918**, one exemplary method of accomplishing step **620** of configuring user-specific and subscriber-specific policies on policy engine **418**. The method typically includes, at **902**, setting access privileges. Access privileges govern who can access the video system with user level and administrator level access privileges. At **904**, the method includes setting inbound/outbound calling privileges on a per-user or per-subscriber basis. For example, every user in an enterprise may be prohibited from making outbound calls on company holidays, except upper

US 6,980,526 B2

13

14

management. At **906**, the method typically includes setting time-of-day privileges per user or subscriber. For example, every user may be restricted from placing calls outside of regular business hours. At **908**, the method typically includes setting maximum video quality privileges per user, or per subscriber.

At **910**, the method typically includes setting 2-way support privileges. This allows a user to either send, receive, or both send and receive videoconferencing data pertaining to a call. At **912**, the method includes setting audio-only restrictions on a per-user or per-subscriber basis. The method includes setting encryption requirements at **914**. At **916**, the method typically includes setting priority privileges on a per-user or per-subscriber basis. Videoconferencing data sent by a user with higher priority privilege will take precedence over other data sent by a user of lower priority, or over other lower priority data, such as email. At **918**, the method typically includes setting videoconferencing call screening. This enables a user or subscriber to block incoming calls from a user-specified source. The policies set in step **620**, and substeps **902–918** are typically saved as user-specific and subscriber-wide settings **408f, 408g**.

While the present invention has been particularly shown and described with reference to the foregoing preferred embodiments, those skilled in the art will understand that many variations may be made therein without departing from the spirit and scope of the invention as defined in the following claims. The description of the invention should be understood to include all novel and non-obvious combinations of elements described herein, and claims may be presented in this or a later application to any novel and non-obvious combination of these elements. Where the claims recite "a" or "a first" element or the equivalent thereof, such claims should be understood to include incorporation of one or more such elements, neither requiring nor excluding two or more such elements.

We claim:

1. A method for videoconferencing using Internet Protocol (IP), the method comprising the steps of:

installing a videoconferencing services switch at an access point to a service provider IP network;

at the switch, registering a plurality of subscribers for videoconferencing services, each subscriber including a plurality of endpoints;

receiving subscriber-specific settings to be applied to multiple videoconferencing calls from the plurality of endpoints associated with each subscriber;

storing the subscriber-specific settings at a location accessible to the switch; and

configuring the switch to connect calls from the plurality of endpoints at each subscriber based on the corresponding subscriber-specific settings.

2. The method of claim **1**, wherein subscriber-specific settings include policies selected from the group consisting of outbound/inbound calling privileges, encryption policies, bandwidth policies, priority among users policies, participation privileges, inbound/outbound calling restrictions, time-of-day restrictions, audio or video restrictions.

3. The method of claim **1**, wherein subscriber-specific settings include firewall settings.

4. The method of claim **1**, wherein subscriber-specific settings include network address translation (NAT) settings.

5. A method for use in videoconferencing, the method comprising:

installing a videoconferencing services switch on a service provider network at an access point configured to enable multiple enterprise subscribers to access a glo-

bal packet-switched computer network to exchange data, including videoconferencing data and non-videoconferencing data, the videoconferencing services switch being configured to process videoconferencing data from multiple enterprise subscribers;

at the videoconferencing services switch, receiving a request for a videoconferencing call from an origination endpoint of one of the multiple enterprise subscribers;

connecting the videoconferencing call to a destination endpoint, the videoconferencing call having associated videoconferencing data; and

securing the videoconferencing call based on subscriber-specific security settings.

6. The method of claim **5**, wherein each enterprise subscriber includes an enterprise gateway positioned on the network between the access point and the origination endpoint, the method further comprising:

routing videoconferencing data from the enterprise gateway to videoconferencing services switch; and

routing non-videoconferencing data from the enterprise gateway around the videoconferencing services switch.

7. The method of claim **6**, wherein the videoconferencing data is routed to the videoconferencing services switch via a direct network connection from an enterprise router to the videoconferencing services switch.

8. The method of claim **6**, wherein the videoconferencing data is routed to the videoconferencing services service switch through an access point edge router.

9. The method of claim **8**, wherein a firewall exists between the enterprise gateway and the video conferencing data is passed the firewall unexamined.

10. The method of claim **9**, wherein the videoconferencing data routed through the firewall is encrypted.

11. The method of claim **10**, where the encryption is achieved using the IPSec protocols.

12. The method of claim **6**, where the videoconferencing data is routed to the switch via a DSL network.

13. The method of claim **12**, where the videoconferencing data is routed to the switch via PVC opened on the DSL network.

14. The method of claim **5**, where the call is connected according to H.323 or SIP protocols.

15. The method of claim **5**, wherein the security settings include firewall settings.

16. The method of claim **5**, wherein the security settings includes NAT settings.

17. The method of claim **5**, wherein subscriber-specific settings include policies selected from the group consisting of outbound/inbound calling privileges, encryption policies, bandwidth policies, priority among users policies, participation privileges, inbound/outbound calling restrictions, time-of-day restrictions, audio or

video restrictions.

18. A system for use in videoconferencing, the system comprising:

multiple enterprise subscriber networks, each enterprise subscriber network having one or more videoconferencing terminals;

a service provider network configured to enable users of the multiple enterprise subscriber networks to access a global computer network via an access point; and

a videoconferencing services switch positioned on the access point of the service provider network, the videoconferencing services switch being configured to process videoconferencing calls from terminals of each

US 6,980,526 B2

15

of the multiple enterprise subscriber networks, based on subscriber specific settings;

wherein a first enterprise subscriber network includes an enterprise video gateway; and

wherein the enterprise video gateway includes an encryption module configured to encrypt videoconferencing data sent between the videoconferencing services switch and the enterprise video gateway.

**19**. The system of claim **18**, wherein the enterprise video gateway includes an emulation module configured to emulate H.323/SIP call control and firewall functionality.

**20**. The system of claim **18**, wherein the encryption module is configured to encrypt videoconferencing data using IP Security (IPSec) authentication and encryption.

**21**. The system of claim **18**, wherein the first enterprise subscriber network includes an enterprise router configured to route videoconferencing data to the videoconferencing services switch.

**22**. The system of claim **18**, further comprising, a direct network connection dedicated to video traffic linking the first enterprise subscriber network and the videoconferencing services switch.

**23**. The system of claim **18**, wherein the access point on the service provider network is a point of presence (POP).

**24**. The system of claim **23**, wherein the service provider network includes an edge router configured to route videoconferencing traffic between the multiple subscriber networks and the videoconferencing services switch.

**25**. The system of claim **23**, wherein the service provider network includes a core router configured to route video-

16

conferencing traffic across a computer network backbone to a destination terminal in a remote zone.

**26**. A system for use in videoconferencing, the system comprising:

multiple enterprise subscriber networks, each enterprise subscriber network having one or more videoconferencing terminals;

a service provider network configured to enable users of the multiple enterprise subscriber networks to access a global computer network via an access point; and

a videoconferencing services switch positioned on the access point of the service provider network, the videoconferencing services switch being configured to process videoconferencing calls from terminals of each of the multiple enterprise subscriber networks, based on subscriber specific settings;

wherein a first enterprise subscriber network includes an enterprise video gateway; and

wherein the videoconferencing services switch includes, (1) a virtual router configured to receive a request for a videoconferencing call from an origination terminal via the enterprise gateway, and (2) a call control module configured to perform call set-up operations, manage call data streams, and perform call tear down operations for the videoconferencing call, wherein the virtual router is configured to route call-related traffic between the origination terminal and the call control module.

\* \* \* \* \*